IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
Northern Division

| | |
|---|---|
| SHEILA A. GREANEY<br>335 Derbyshire Lane<br>Riva, Maryland 21140<br><br>　　Plaintiff,<br><br>　　v.<br><br>CHRISTINE WORMUTH, Secretary,<br>U.S. Department of the Army<br>101 Army Pentagon<br>Washington, DC 20310-0101<br><br>　　Defendant. | Civil Action No.<br><br>Jury Trial Demanded |

**COMPLAINT**

Sheila Greaney ("Plaintiff"), by and through her undersigned counsel, complains of the Department of the Army ("Defendant" or "Army") as follows:

**PARTIES**

1. Plaintiff is a resident of Riva, Maryland.

2. On information and belief, Christine Wormuth, Secretary for the Department of the Army, is named in her official capacity as the Defendant that employed Plaintiff.

**JURISDICTION AND VENUE**

3. This Court has federal question jurisdiction under 28 U.S.C. § 1331 and pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq.* ("Title VII").

4. Venue is proper in this judicial district because Defendant is located here and because the unlawful employment practices giving rise to these actions were committed and occurred in this District.

**EXHAUSTION OF ADMINISTRATIVE REMEDIES**

5. Plaintiff exhausted her administrative remedies by timely filing this lawsuit within 90 days of September 17, 2021, the date Plaintiff received the Office of Federal Operations of the U.S. Equal Employment Opportunity Commission ("EEOC") decision (dated September 15, 2021) regarding her complaint identified as ARMEADE19OCT04528.

6. Additionally, more than 180 days have passed since Plaintiff filed a separate formal complaint (identified as ARMADE21DEC00192) on or about February 18, 2021, and the Defendant has not issued a final decision in that matter.

**STATEMENT OF FACTS**

*Background Information*

7. Plaintiff has been employed as a Clinical Psychologist, Medical Evaluation Board ("MEB") Psychologist, at the Kimbrough Ambulatory Care Center ("KACC"), Integrated Disability Evaluation Section ("IDES"), Fort Meade, Maryland since 2012.

8. From 2012 to present, Plaintiff's position description and performance plan require that she spend 75% of her work hours working for the IDES clinic, primarily reviewing medical records and writing narrative summaries ("NARSUMs") regarding the history and severity of service members' mental health disabilities and responding to requests for Independent Medical Reviews and appeals.  Per her position description and performance plan, the other 25% of Plaintiff's time is assigned to work for the Integrated Behavioral Health ("IBS") clinic, primarily providing direct mental health therapy and counseling to service members.

9. From 2012 to 2019, Plaintiff generally spent four days per week performing record review and writing NARSUMs for the IDES and one day per week providing counseling services.

10. Plaintiff is female.

11. At all relevant times, Plaintiff's supervisors including Denise Richardson, Erika Barger, and Kimberly Salazar were aware of Plaintiff's sex (female).

*Plaintiff's Protected Activity*

12. Plaintiff contacted an EEO official employed by Defendant on or about October 8, 2019 to report discrimination by her supervisors, Dr. Denise Richardson and Dr. Erika Barger.

13. The EEO counselor assigned for the informal complaint period informed Dr. Richardson and Dr. Barger of Plaintiff's complaint at least as of October 23, 2019 and they were both interviewed regarding the same.

14. Plaintiff's complaint was not resolved within the informal period and she was issued a Notice of Right to File a Formal Complaint on or about November 7, 2019.

15. Plaintiff timely filed a Formal Complaint on or about November 22, 2019.

16. Defendant assigned the claims in the November 22, 2019 Formal Complaint identification number ARMEADE19OCT04528.

17. Plaintiff initiated a second EEO complaint through Defendant on or about December 10, 2020 alleging discrimination and retaliation for protected EEO activity by her supervisors COL Kimberly Salazar and Dr. Erika Barger.

18. Dr. Barger and COL Salazar were informed of Complainant's complaint in ARMADE21DEC00192 on or about December 17, 2020.

19. The matter was not resolved during the informal processing period and Plaintiff timely filed a formal complaint on or about February 17, 2021.

20. The claims in the second complaint were given the identification number ARMADE21DEC00192.

*Plaintiff was Denied Regular Telework*

21. Over the course of her employment, Plaintiff made numerous requests to be permitted to work from an off-site location ("telework") on a regular, recurring basis (as opposed to requests for *ad-hoc* or situational telework for special circumstances).

22. For example, Plaintiff's requests for regularly scheduled telework included written requests submitted in or about October 2018 and August 2019.

23. Through spring of 2020, Plaintiff's requests for regular, recurring telework were denied or constructively denied through non-response.

24. Although in the fall of 2019, Plaintiff was permitted situational telework for a limited time period to care for the medical needs of a family member, she was required to return to work on-site with no regularly scheduled telework after the temporary period ended.

25. Plaintiff was also required to work a set duty schedule of specific days and hours per pay period or request leave or special permission to "make up" or "flex" work hours if she could not work during her set duty schedule.

26. From approximately 2016 to March 2020, Michael Lynch was also an MEB Psychologist working for the KACC IDES.

27. Michael Lynch is male.

28. Dr. Lynch and Plaintiff performed the same duties for IDES and were rated on the same performance elements with regard to their IDES duties.

29. Plaintiff and Dr. Lynch reported to the same supervisory chain when they both worked performing duties for the IDES.

30. While working for and performing duties for the KACC IDES, Dr. Lynch was permitted to telework on a regular, recurring basis.

31. Dr. Lynch teleworked every day or nearly every day and rarely performed his work at the KACC at Fort Meade. Instead, Dr. Lynch performed the vast majority of his duties from his home or other non-military locations.

32. Dr. Lynch was also not required to perform his duties on a set duty schedule; instead, he was permitted to choose to perform his duties at night (after 5:00 p.m.) and on weekends, at his own discretion and by setting his own schedule.

33. Dr. Lynch was not required to request leave or the ability to make up work hours if he did not complete his work during regular business hours.

34. Because he was permitted to telework, Dr. Lynch was not required to attend the same office meetings as Plaintiff or engage in the same administrative duties.

35. For example, Dr. Lynch did not attend the "morning huddle" (staff meetings), IDES Service line meetings or command "stand down" meetings, or "lunch and learn" meetings, nor was he present to handle routine operation matters in the IDES clinic.

36. Upon information and belief, Dr. Denise Richardson offered Kenneth Leonard (male) a position performing MEB reviews at KACC IDES with the ability to regularly telework.

37. In March 2020, Plaintiff was granted full-time situational telework due to the global COVID-19 pandemic (this situational telework was granted to all IDES providers at the time).

38. On or about September 21, 2020, Defendant modified Plaintiff's situational telework to one day per week on-site with four days of telework and on March 29, 2021, Defendant modified Plaintiff's situational telework to two days per week on-site with three days of telework.

39. To date, Plaintiff has not been granted a regular, recurring telework schedule outside of the situational telework granted based on the pandemic.

40. Plaintiff could have performed her duties, particularly her IDES duties, if granted a regular, recurring telework schedule.

41. Regular, recurring telework was a benefit of employment denied to Plaintiff.

42. There was no legitimate reason to deny or fail to respond to Plaintiff's requests for regular, recurring telework.

*Background of the Credentialing and Privileging Process and Requirements*

43. Defendant requires clinical psychologists, such as Plaintiff, to meet Defendant's requirements of "privileged providers" in order to be authorized to perform certain duties of the position at a Defendant institution.

44. Provider "credentialing" is the process by which Defendant collects data to evaluate a privileged provider's credentials (including education, training, experience, professional licensure, certification, and competence and judgment).  The information collected in the credentialing process is used to make decisions delineating, expanding, or limiting a provider's "clinical privileges."

45. "Clinical privileges" grant and define the individual privileged provider's authorized scope of practice at a Defendant institution and are granted based on Defendant's review of the provider's credentials, clinical competence, and mission needs.

46. Credentialing and privileging is often referred to as "C&P."

47. Privileged providers, including clinical psychologists, must undergo the credentialing process and be granted clinical privileges upon appointment to their positions.

48. Reappraisal of a privileged provider's defined clinical privileges must take place after the first 12 months of service and then every 24 months thereafter.

49. Upon reappraisal, renewal of defined clinical privileges is based on the provider's professional qualifications and demonstrated competence to perform the privileges requested.

50. Upon review of a request for renewal, privileges may be renewed or they may be modified, limited, restricted, denied, and/or subject to remedial training or enhanced supervision.

51. Failure to maintain clinical privileges can result in a provider becoming unauthorized to perform required duties of his/her position and/or lead to a provider being removed from his/her employment and position.

52. Credentialing and privileging decisions are made by the Credentialing Committee and executive board of Defendant facilities who recommend final action to the MEDDAC Commander.

53. Dr. Denise Richardson, IDES Chief, was a member of the KACC Credentialing Committee from approximately December 2014 to August 2019.  As IDES Chief, Dr. Richardson was Plaintiff's direct supervisor.

54. As a member of the Credentialing Committee and as Chief of Plaintiff's service line, Dr. Richardson participated in and gave input into decisions regarding Plaintiff's credentialing and privileging.

55. From approximately May 2010 to September 2019, Dr. Erica Barger was Chief of the Department of Primary Care.  From October 2019 to present, Dr. Erica Barger has been the Chief of the IDES.  As IDES Chief, Dr. Barger is Plaintiff's direct supervisor.

56. As a member of the Credentialing Committee, Executive Committee of the Medical Staff, and Chief of IDES, Dr. Barger participated in and gave input into decisions regarding Plaintiff's credentialing and privileging.

57. From approximately July 2019 to June 2021, COL Kimberly Salazar was the Deputy Commander for Clinical Services.  In this position, Plaintiff's second-level supervisor.

58. As the Chairperson of the Executive Committee of the medial staff, a member of the Credentialing Committee, and Deputy Commander for Clinical Services, COL Salazar

participated in and gave input into decisions regarding Plaintiff's credentialing and privileging.

### *Plaintiff's Request for Sub-Specialty Privileges is Denied*

59. Plaintiff earned a doctorate degree in Clinical Psychology in 1995, completed an APA Accredited Internship in clinical psychology at Walter Reed Army Medical Center in 1995, and has over 25 years of experience in clinical psychology.

60. Plaintiff underwent the C&P process upon her initial appointment as a Clinical Psychologist for Defendant in 2012 and was granted privileges in Clinical Psychology, Command-directed evaluations, Disability Evaluation System behavior health evaluations and narrative summaries, Personnel assessment and selection programs, Individual Therapy, Group Therapy, Marital/Couple Therapy, Family Therapy, Clinical Health Psychology, Pediatric Psychology, and Aeromedical psychology.

61. These privileges were approved for renewal at Plaintiff's first 12-month review, in 2013, and after her first biennial review, in 2015.

62. When Plaintiff's privileges were due for reappraisal and renewal in 2017, she timely submitted her request that all of her previously-granted privileges be renewed.

63. However, in 2017, Plaintiff received a request from the Credentialing office that she withdraw her request to be privileged in the sub-specialties of Clinical Health Psychology and Pediatric Psychology.

64. Plaintiff was informed that these sub-specialty privileges would not be renewed because she had not completed a fellowship in these subspecialities.

65. The policy the Credentialing Office purported to rely upon for this decision was expired and should not have applied.

66. Plaintiff withdrew her request for these sub-specialties as part of her complete 2017 renewal application and instead submitted a separate request for them via separate cover in October 2017.

67. Plaintiff was then required to write a memorandum supporting her application for renewal in these sub-specialties.

68. On or about October 15, 2019, Plaintiff received a letter stating that her request for renewal of privileges in Clinical Health Psychology and Pediatric Psychology was denied.

69. Upon information and belief, other clinical psychologists, to include Dr. Steve Berkowitz, who were not female and/or who did not engage in protected EEO activity were approved for sub-specialty privileges (such as Clinical Health Psychology) even though they had not completed fellowships in these areas.

70. Additionally, these similarly-situated individuals, were not required to submit additional memorandum supporting their privileging requests in these areas.

*Plaintiff's Sub-Specialty Privilege is Denied and Other Privileges Expire without Renewal: October 2019 to June 2020:*

71. The privileges renewed by the Credentials Committee in October 2017 (including the privileges for Clinical Psychology, Command-directed evaluations, Disability Evaluation System behavior health evaluations and narrative summaries, Personnel assessment and selection programs, Individual Therapy, Group Therapy, Marital/Couple Therapy, Family Therapy) were granted for the regulatory period of 24 months, to end on or about October 24, 2019.

72. Although Plaintiff timely initiated her application to renew her privileges, the Credentials Committee did not grant the remainder of Plaintiff's request for renewal of privileges before her privileges expired on October 24, 2019.

73. Therefore, Plaintiff was not privileged to perform any of her assigned duties for a period beginning on or about October 25, 2019.

74. There was no legitimate reason for failing to renew (and therefore denying) Plaintiff's request for privileges in 2019.

75. There was no change to Plaintiff's credentials, competency, or professionalism between 2012 and 2019.  Plaintiff excelled in all of those areas.

76. There was no change to law, regulation, or policy that permitted Plaintiff to perform her duties as a Clinical Psychologist in IDES or IBHC primary care without clinical privileges and other privileges.

77. From 2017 to 2019, Defendant (including Dr. Richardson, Dr. Barger, and COL Salazar) failed to ensure that Plaintiff's work underwent peer review as required by policy.

78. In 2019, Defendant (including Dr. Richardson, Dr. Barger, and COL Salazar) failed to complete a Performance Assessment Report ("PAR") of Plaintiff's IDES and clinical work, which is a required component of privileging process.

79. However, Plaintiff's work had been observed and evaluated by her direct and second-level supervisors during the relevant time period.

80. Any legitimate questions about or need to document Plaintiff's competency for the privileging process could have been easily addressed by Plaintiff's proficiency reports, by evidence submitted by Dr. Richardson and/or Dr. Barger, and/or by performing retroactive peer reviews and the PARs.

81. Peer reviews are conducted solely by reviewing documentation of prior clinical encounters, therefore, there is no reason they cannot be performed retroactively.

82. From October 2019, Plaintiff attempted to resolve the Agency's proffered reasons for not renewing her privileges by providing additional information and documentation and by inquiring about status.

83. Defendant, including Dr. Richardson and COL Salazar, first ignored and failed to follow Army, Department of Defense/Defense Health Agency, and other regulations governing the credentialing and privileging process and requirements with regard to Plaintiff.

84. In late 2019/early 2020 Defendant (including COL Salazar) wrongly claimed that Plaintiff did not need privileges in order to perform her position duties.

85. In May 2020, Defendant (COL Salazar) claimed policy guidance and a "fragmented order" prevented Defendant from renewing or restoring Plaintiff's privileges, however, the fragmented was inapplicable and also expired.

86. Upon information and belief, Dr. Richardson and COL Salazar knew the policy guidance and "fragmented order" were inapplicable and also expired.

87. The Department of Defense Tri-service (Army, Navy, Air Force) Master Privilege List for Clinical Psychology includes a standardized privilege for Disability Evaluation System behavioral health evaluations and narrative summaries.

88. On or about February 12, 2020 and February 13, 2020, Dr. Barger attempted to instruct Plaintiff to re-write the DHA Master Privilege List (MPL) for Clinical Psychologists.

89. In May 2020, COL Salazar directed Plaintiff to submit a new application for privileges and stated that Plaintiff was only to request privileges that COL Salazar had created in the application systems (thereby, COL Salazar rewrote the privilege list for Plaintiff, modifying the DHA Master Privilege List).

90. Defendant had no authority to re-write or modify the Master Privilege List for the Clinical Psychology Core "Scope of Privileges" or to direct Plaintiff to re-write or apply for privileges inconsistent with these lists.

91. When Plaintiff's privileges were not granted or renewed by May 2020, she filed a complaint with the Regional Health Command-Atlantic Inspector General's Office ("IG").

92. The IG investigated and, in or about late May 2020 and June 4, 2020, the IG informed the KACC and Fort Meade that Plaintiff's Position Description must be followed and, therefore, her clinical privileges should be renewed at the same level she had previously been granted.

93. The IG informed Defendant that the fragmented order upon which they had purported to rely when determining Plaintiff's privileges in 2019 and 2020 did not apply.

94. On or about June 29, 2020, Defendant informed Plaintiff that her clinical privileges were restored to include the Clinical Health Psychology privilege.

*Effect of Privileging Actions, Delays, and Denials on Plaintiff from 2019 to June 2020*

95. From approximately October 25, 2019 to June 29, 2020, the Agency directed Plaintiff to continue performing her duties for IDES (including using her clinical skills to write NARSUMs) even though she was not privileged to do so.

96. This direction exposed Plaintiff to potential adverse action for performing duties she was not privileged to perform.

97. On December 18, 2019, Dr. Barger directed Plaintiff to conduct Temporary Disabled Retirement List (TDRL) examinations without privileges. Based on the Veteran's Benefits Administration's determination that TDRLs to be forensic evaluations for which privileges are required, Plaintiff was unable to comply with Dr. Barger's direction.

98. This direction exposed Plaintiff to potential adverse action for refusing to perform duties as directed because she was not privileged to perform them.

99. From approximately October 25, 2019 to June 29, 2020, the Agency prohibited Plaintiff from performing clinical care duties and providing clinical counseling because her privileges had not been renewed.

100. This interfered with Plaintiff's ability to perform her duties, altered the duties of her position, and exposed her to potential adverse action up to and including removal from service because she was not able to perform all the duties of her position.

101. Denial and non-renewal of clinical privileges also harmed Plaintiff's professional reputation, work relationships, and client relationships because she was not able to perform her clinical duties as scheduled or maintain therapeutic relationships and continuity of care with patients.

102. Additionally, in or about June 2020, Plaintiff was informed that she would have to undergo a Focused Practitioner Performance Evaluation ("FPPE"), a specialized supervision and evaluation for healthcare providers, because so much time had elapsed during which she had not been permitted to engage in certain duties.

103. All of the above conditions (in which Plaintiff was required to perform some duties without proper privileges and was prevented from performing other duties due to Defendant's refusal or failure to renew her privileges) caused Plaintiff to suffer severe stress, anxiety, frustration, professional embarrassment and humiliation, and fear that she would suffer adverse employment actions and/or permanent professional harm due to the Defendant's actions.

*Failure to Restore Plaintiff to Clinical Duties: June 2020 to Spring 2021*

104. After Plaintiff was informed that her clinical privileges were restored in June 2020, she attempted to resume the clinical counseling services she had previously provided and that were required under her Position Description and performance plan.

105. At first, Plaintiff believed that she would be contacted by her superiors regarding returning to clinical to care.

106. When that did not occur, Plaintiff began to contact Defendant managers and her supervisors so that she could resume her clinical counseling duties.

107. Plaintiff contacted the chief for Behavioral Health services about being scheduled to see patients in clinical care on or about July 22, 2020 and July 29, 2020.

108. Plaintiff contacted her supervisor, Dr. Barger, and her senior level rater/supervisor, COL Salazar, about resuming clinical care on August 31, 2020.  COL Salazar told Plaintiff to hold off.

109. On September 21, 2020, COL Salazar informed Plaintiff that she could not begin clinical duties because COL Salazar still needed to outline the criteria of the required FPPEs (in Command-directed evaluations and Personnel assessment evaluations) and OPPE ("Ongoing Professional Practice Evaluation") and assign duties to Plaintiff.

110. On or about November 2, 2020, though Plaintiff still had not been assigned clinical duties, Dr. Barger issued Plaintiff's mid-point performance evaluation for the period March 2020 to April 2021.

111. To that point, Plaintiff was not able to perform any of her duties in the 25% of her position that required her to perform clinical services.

112. In the mid-point evaluation, Dr. Barger wrote that Plaintiff was "working with [Behavioral Health] to develop a plan to resume clinical care." This comment falsely

described the situation – Defendant management was responsible for crafting the FPPE/OPPE and scheduling Plaintiff for clinical care services and management had failed to do so.

113. Plaintiff engaged in numerous continued attempts to be scheduled for clinical care duties. For example, on January 21, 2021, she responded substantively to a request for days on which she was available to be scheduled for clinical services (per her Position Description and prior practice, the schedule would be for her to work in a clinical setting one day per week).

114. In early 2021, Plaintiff reviewed the prior MEDDAC Commander, COL Burk's, email to Plaintiff indicating that before her privileges could be restored in June 2020, a PAR (Performance Assessment Report) would have to be conducted.

115. PARs are the responsibility of Defendant management.

116. PARs are completed by review of medical records, prior peer reviews, and other notes, therefore, they can be completed retroactively at any time.

117. Plaintiff realized that she had never been informed whether or when the PAR was completed in order to restore her privileges in June 2020.

118. PARs should have been completed to properly restore her privileges for work in the IDES and clinical care.

119. In early 2021, Plaintiff inquired of COL Salazar regarding the status of the PARs, whether they were conducted, and, if not, what authority was used to restore her privileges without this requirement being met.

120. When Plaintiff did not receive a response from COL Salazar, she elevated this request for information to the new Deputy Commander for Clinical Services, COL Okpokwasili.

121. Plaintiff has never received a substantive response to her inquiry to indicate that the PARs were completed or the requirement was waived through a proper regulatory or other authority.

122. Upon information and belief, the required PARs were never completed and, therefore, none of Plaintiff's privileges were properly restored.

*Effect of Privileging Actions and Failure to Act from June 2020 to Present*

123. From June 2020 to present, Defendant has failed to conduct the necessary steps (including the PARs) in order for the restoration Plaintiff's clinical privileges to be proper.

124. Plaintiff's performance of her IDES duties without being *properly* privileged exposes her to potential adverse action up to and including removal from her position.

125. From June 2020 to present, Defendant has failed to assign Plaintiff clinical care duties in IBHC or another clinical setting per the requirements of her Position Description.

126. Even if Plaintiff were scheduled for clinical care duties, there is still an issue of whether the privileges were properly restored.  This would force Plaintiff to choose between performing her duties without proper privileges or to refuse to perform duties as directed, exposing her to potential adverse action either way.

127. Because Plaintiff has now been prevented from performing clinical privileges for more than two years, upon her next renewal application, she may be denied the privileges or required to undergo an additional period of monitoring, supervision, and evaluation in order for the privileges to be renewed.

128. The failure of Defendant to properly restore Plaintiff's privileges, failure to schedule her for clinical duties, and failure to respond to her inquiries regarding whether PARs were completed or whether the requirement was properly waived has interfered with Plaintiff's

ability to perform her duties, altered the duties of her position, and exposed her to potential adverse action up to and including removal from service because she was not able to perform all the duties of her position.

129. The failure of Defendant to properly restore Plaintiff's privileges, failure to schedule her for clinical duties, and failure to respond to her inquiries regarding whether PARs were completed or whether the requirement was properly waived has caused Plaintiff severe stress, anxiety, frustration, professional embarrassment and humiliation, and fear that she would suffer adverse employment actions and/or permanent professional harm due to the Defendant's actions.

## COUNT 1

*(Title VII – Discrimination (sex) – Denial of Regular Telework)*

130. Plaintiff repeats and realleges paragraphs 1–129, as if fully set forth herein.

131. By and through their conduct, Defendant subjected Plaintiff to unlawful discrimination based on sex (female) in violation of Title VII of the Civil Rights Act of 1964.

132. Defendant acted with malice or reckless indifference to Plaintiff's rights.

133. As a result, Plaintiff has suffered damages, including but not limited to lost wages and benefits, emotional distress, and pain and suffering; and seeks punitive damages.

## COUNT 2

*(Title VII – Discrimination (sex): Privileging Actions/Inactions and Alteration of Duties)*

134. Plaintiff repeats and realleges paragraphs 1–129, as if fully set forth herein.

135. By and through their conduct, Defendant subjected Plaintiff to unlawful discrimination based on sex (female) in violation of Title VII of the Civil Rights Act of 1964.

136. Defendant acted with malice or reckless indifference to Plaintiff's rights.

137. As a result, Plaintiff has suffered damages, including but not limited to lost wages and benefits, emotional distress, and pain and suffering; and seeks punitive damages.

## COUNT 3

*(Title VII- Retaliation for Prior EEO Activity: Denial of Regular Telework)*

138. Plaintiff repeats and realleges paragraphs 1–129, as if fully set forth herein.

139. By and through their conduct, Defendant subjected Plaintiff to unlawful retaliation in violation of Title VII of the Civil Rights Act of 1964.

140. Defendant acted with malice or reckless indifference to Plaintiff's rights.

141. As a result, Plaintiff has suffered damages, including but not limited to lost wages and benefits, emotional distress, and pain and suffering; and seeks punitive damages.

## COUNT 4

*(Title VII - Retaliation for Prior EEO Activity: Privileging Actions/Inactions and Alteration of Duties)*

142. Plaintiff repeats and realleges paragraphs 1–129, as if fully set forth herein.

143. By and through their conduct, Defendant subjected Plaintiff to unlawful retaliation in violation of Title VII of the Civil Rights Act of 1964.

144. Defendant acted with malice or reckless indifference to Plaintiff's rights.

145. As a result, Plaintiff has suffered damages, including but not limited to lost wages and benefits, emotional distress, and pain and suffering; and seeks punitive damages.

## COUNT 5

*(Title VII – retaliation:  Hostile Work Environment)*

146. Plaintiff repeats and realleges paragraphs 1–129, as if fully set forth herein.

147. By and through their conduct, Defendant subjected Plaintiff to unlawful retaliation in violation of Title VII of the Civil Rights Act of 1964.

148.　Defendant acted with malice or reckless indifference to Plaintiff's rights.

149.　As a result, Plaintiff has suffered damages, including but not limited to lost wages and benefits, emotional distress, and pain and suffering; and seeks punitive damages.

## JURY DEMAND

Plaintiff demands a trial by jury on all counts contained in the Complaint.

WHEREFORE, Plaintiff respectfully requests this Court enter judgment against the Defendant on all Counts and award Plaintiff lost wages and benefits, compensatory damages in the amount of $300,000, or in an amount to be determined at trial, for pain and suffering and emotional distress, pre- and post-judgment interest, costs, attorneys' fees, punitive damages, and any such other relief as is just and proper.

Date:   December 16, 2021　　　　　　　　　　　RESPECTFULLY SUBMITTED,

Alan Lescht & Associates, P.C.
By: /s/ Laura L. Nagel
Laura Nagel [Bar # 21537]
ALAN LESCHT & ASSOCIATES, P.C.
1825 K Street, N.W., Suite 750
Washington, D.C. 20006
Tel: (202) 463-6036
Fax: (202) 463-6067
Laura.nagel@leschtlaw.com
*Attorney for Plaintiff*